# EXHIBIT D

```
 1                    UNITED STATES DISTRICT COURT

 2                   CENTRAL DISTRICT OF CALIFORNIA

 3                        WESTERN DIVISION

 4

 5   SPARKS LANDEN, individually   )
     and on behalf of all others   )
 6   similarly situated,           )
                                   )
 7                   Plaintiff,    )
                                   )
 8   vs.                           ) Case No.
                                   ) CV13-01033-DSF (SHx)
 9   ELECTROLUX HOME PRODUCTS,     )
     INC., a Delaware Corporation; ) Volume I
10   CARLSONS APPLIANCES, INC. a   )
     California Corporation; and   )
11   DOES 1 through 20, inclusive, )
                                   )
12                   Defendant.    )
     _____)
13

14

15

16         VIDEOTAPED DEPOSITION OF C. SPARKS LANDEN

17                   Santa Monica, California

18                   Thursday, April 24, 2014

19

20

21

22

23

24   Reported by:  Ruth C. Moore
                   CSR No. 8444
25   NDS Job No:   161830

                                                        1
```

C. Sparks Landen                                                    April 24, 2014

 1    became a lawyer, but I know it was approximately

 2    10 years ago.

 3         A.   I would say approximately until '85.

 4         Q.   Okay.  And where did you work next?

 5              MR. RAPKIN:  Objection.  Vague and

 6    ambiguous.  Do you mean after construction or after

 7    kitchen designing?  I think that came after

 8    construction.

 9              MR. KIM:  I don't think we've gone to that

10    point.

11              MR. RAPKIN:  I don't want to put words in

12    his mouth, but I think that's been asked and

13    answered.  Is your question what did Mr. Landen do

14    after construction in 1985?

15              MR. KIM:  After he worked for his father.

16    And he said --

17         Q.   When you worked for your father you did

18    mostly grunt work; correct?

19         A.   Pretty much.

20         Q.   Okay.  And where did you work after your

21    father?

22         A.   I worked independently.

23         Q.   Okay.  And what did you do independently?

24         A.   Kitchen design and kitchen cabinetry

25    install.

                                                          17

Ex. D
Page 85

C. Sparks Landen                                                  April 24, 2014

| | | |
|---|---|---|
| 1 | A. | (Witness nods.) |
| 2 | Q. | What brand of washing machine was that? |
| 3 | A. | That stopped working? |
| 4 | Q. | Uh-huh. |
| 5 | A. | I don't know. |
| 6 | Q. | What brand did you replace it with? |
| 7 | A. | Whirlpool. |
| 8 | Q. | And that would have been around 2012? |
| 9 | A. | Approximately. |
| 10 | Q. | Okay. Why did you go with a Whirlpool? |
| 11 | A. | They were on sale, and they seemed -- they |
| 12 | | seemed like they had -- they seemed like pretty good |
| 13 | | units, machines. |
| 14 | Q. | The look of the machines? |
| 15 | A. | Yeah. |
| 16 | Q. | Okay. |
| 17 | A. | The bells and whistles. |
| 18 | Q. | What do you mean by bells and whistles? |
| 19 | A. | All the different features, speeds, |
| 20 | | controls. |
| 21 | Q. | Anything else? |
| 22 | A. | And the price. |
| 23 | Q. | Okay. Was that a -- was that a top-loading |
| 24 | | machine, or was that a combo laundry center? |
| 25 | A. | The washing machine was a top-loader, a |

34

C. Sparks Landen                                                    April 24, 2014

1       A.    No.

2       Q.    How long did you own that property?

3       A.    About two years.

4       Q.    So it was vacant for two years?

5       A.    No.

6       Q.    Who lived there?

7       A.    No one.

8       Q.    I think I'm confused.

9       A.    I tore a house down and built a house

10   there.

11      Q.    Oh, okay.  And it took two years --

12   two years to build?

13      A.    (Witness nods.)

14      Q.    Okay.  Did it take two years to build?

15      A.    (Witness nods.)

16      Q.    Audible answers.

17      A.    Yes.  Sorry.

18      Q.    Did you design the house?

19      A.    Aesthetics.

20      Q.    Right.

21      A.    I was not the architect.

22      Q.    So you picked the fixtures and --

23      A.    I did.

24      Q.    Okay.  What about the appliances?

25      A.    I did.

                                                            39

C. Sparks Landen                                                    April 24, 2014

1       Q.   And how did you make those decisions?   Was

2    that price and aesthetics again?

3       A.   Yes.   It was more aesthetic and brand name,

4    actually.

5       Q.   What brand names?

6       A.   Viking, Bosch, Franke, KWS fixtures.

7       Q.   What about the washers and dryer?

8       A.   I don't recall if I put a washer and dryer

9    into the unit before sale.  I don't believe so.

10      Q.   When you say "before sale," obviously --

11      A.   I don't --

12      Q.   -- not after.

13      A.   Well, I built the house.  I don't think

14   I -- I don't think I put washer and dryers in.

15      Q.   Do you know why?

16      A.   Didn't need to.  It's a new home.

17      Q.   What do you mean by that you didn't need to

18   because it's a new home?

19      A.   New construction, typically it's not

20   typical to see or it's required or typical to see

21   washers and dryers supplied in new construction.

22      Q.   Okay.  So what did you like about -- was

23   the Viking -- was that a stove or --

24      A.   Viking range, refrigerator, possibly a

25   warming drawer.  I don't recall if I put one in or

                                                              40

C. Sparks Landen                                             April 24, 2014

1        Q.    Similar consideration?

2        A.    Yes.

3        Q.    KWS?

4        A.    Yes.

5        Q.    So you sold that property in approximately

6    2007?

7        A.    Yes.

8        Q.    And what was the second property you owned

9    during that time frame?  You mentioned that there

10   were three other properties that you didn't live in.

11       A.    Right.  The second one was in 2005, May or

12   June, approximately.  That was also in Venice.  It's

13   a four-unit apartment complex.

14       Q.    And what was the third property you

15   referenced?

16       A.    Property in Venice.

17       Q.    And when did you buy that property?

18       A.    November 2010.

19       Q.    What kind of property was that?

20       A.    Single-family home.

21       Q.    Was that new?

22       A.    No.

23       Q.    Was that another one where you tore down

24   the house and built a new one?

25       A.    Yes.

                                                            42

C. Sparks Landen                                                April 24, 2014

1    that in.

2        A.    Wolf, Bosch, Sub-Zero, Duravit, basically,

3    yeah.

4        Q.    Okay.   And the same consideration that went

5    into the property that you bought in 2005 that you

6    rebuilt the house -- or not rebuilt but built a

7    house, with respect to buying the appliances, was

8    the same consideration involved; in other words, you

9    bought based on the brand name and the status?

10       A.    Yes.

11       Q.    Anything else?

12       A.    I understand that Wolf and Sub-Zero is

13   supposed to be very good quality.

14       Q.    What's that understanding based upon?

15       A.    Word of mouth.

16       Q.    And that's based -- word of mouth in the

17   kitchen design?

18       A.    No, just kind of word on the street, just

19   talking to people that have them and like them.

20       Q.    Why did you go with Wolf instead of Viking

21   this time?

22       A.    Because it's my personal home.

23       Q.    I'm confused.   So the home you bought in

24   2010 you live in?

25       A.    I haven't moved into it yet.

                                                          44

C. Sparks Landen                                                      April 24, 2014

1        Q.   Oh, okay.   Okay.   So why would that make a

2    difference that it's your personal home?

3        A.   Because my wife wants Wolf and Sub-Zero.

4        Q.   Any other reason?

5        A.   I understand they're really great quality,

6    efficient units.

7        Q.   What about the Viking, are those not great

8    quality?

9        A.   I understand those are supposed to be very

10   good quality also.

11       Q.   So the only distinguishing feature is that

12   your wife wanted Wolf?

13       A.   (No verbal response.)

14       Q.   Audible answer.

15       A.   Yes.

16       Q.   And the same with the Sub-Zero, is that the

17   only distinguishing feature?

18       A.   Yes.

19       Q.   Do you want to take a break?

20       A.   Yes.

21            THE VIDEOGRAPHER:   Off the record.   The

22   time is 11:12.

23            (Recess taken.)

24            THE VIDEOGRAPHER:   Back on the record at

25   11:26.

                                                          45

C. Sparks Landen                                                    April 24, 2014

1            MR. KIM:  The witness is.  They used the

2    machines.

3            MR. RAPKIN:  We're not claiming there's an

4    overflow.  So getting the details on the machines is

5    just not relevant here.  These tenants are not part

6    of the class.  They're not part of the merit portion

7    of the case.  And the privacy rights, as far as I'm

8    concerned, would override any materiality that you

9    think might be involved.

10   BY MR. KIM:

11        Q.   Do you use the machines personally,

12   Mr. Landen?

13        A.   No.

14        Q.   Okay.

15            They're the only people with firsthand

16   knowledge about the machines.

17            MR. RAPKIN:  Well, he's the landlord.  If

18   there's a problem with the machines that he -- he

19   bought and he provided, he would -- he can tell you,

20   and he will tell you if any of them have overflowed.

21            But for us to provide you with the names of

22   the tenants is not relevant, invades the tenancy --

23   tenant's privacy rights, and there's no claim that,

24   by them or by Mr. Landen, any of his machines,

25   washing machines or dryers, burst.  And that's the

                                                            49

C. Sparks Landen                                                      April 24, 2014

```
 1    20 years.
 2         Q.    So your expectation is that, if you buy an
 3    appliance, it should last 20 years; correct?
 4         A.    I would like it to.
 5         Q.    Would you expect it to?
 6         A.    I don't know.
 7         Q.    You just have no understanding as to how
 8    long it should last?
 9         A.    I'm not sure.
10         Q.    Okay.  So you don't know?
11         A.    I don't know.
12         Q.    Okay.
13              THE VIDEOGRAPHER:  Jason, could you raise
14    your mike.  You're rubbing.
15              MR. KIM:  It is on the left side.
16              THE VIDEOGRAPHER:  That's a good spot for
17    it.  Thank you.
18    BY MR. KIM:
19         Q.    So the units are in the building.  So they
20    don't have to put in quarters every time they use
21    the washing machine; correct?
22         A.    That is correct.
23         Q.    And you don't know how often the washing
24    machines are used; correct?
25         A.    I don't know exactly.
```

54

C. Sparks Landen                                                April 24, 2014

```
 1    problem?

 2         A.   Me.

 3         Q.   Do you carry insurance for the building?

 4         A.   Yes.

 5         Q.   Okay.  And would it cover damage as a

 6    result of a washing machine overflow?

 7              MR. RAPKIN:  I'm going to just caution you

 8    if you know the answer to that --

 9              THE WITNESS:  I don't know the answer to

10    that.

11    BY MR. KIM:

12         Q.   Okay.  So you testified earlier that you

13    believe appliances in general should last 20 years;

14    correct?

15         A.   I'd like them to.

16         Q.   But if they break down sooner, that doesn't

17    matter?

18         A.   I'd like appliances to last 20 years.  I

19    don't know if they don't.  I don't know if they will

20    or not.

21         Q.   What if they don't?

22              MR. RAPKIN:  Objection.  Calls for

23    speculation, vague and ambiguous.

24    BY MR. KIM:

25         Q.   What if they don't last that long?  You can
```

60

1              MS. SCHMIDT:   Objection.   The term problems

2      and dissatisfaction is vague.   Do you mean whether

3      his machines have overflowed?

4      BY MR. KIM:

5          Q.   You can answer.

6          A.   The question is vague to me.   They have not

7      overflowed.

8          Q.   So have you ever been dissatisfied with the

9      machines?

10         A.   I am dissatisfied now.

11         Q.   Okay.   And that's based on what lawyers

12     have told you; correct?

13         A.   It's based on what I've learned about them.

14         Q.   And that was from lawyers; correct?

15         A.   That was from my tenant and later from my

16     lawyers.

17         Q.   Who is your tenant?

18         A.   Scott Rapkin.

19         Q.   Who is also your lawyer?

20         A.   He was only my tenant at the time.

21         Q.   But he's now your lawyer?

22         A.   That is correct.

23         Q.   Okay.   So the only dissatisfaction you've

24     had with your machine is based on what your current

25     lawyers have told you; correct?

                                                              65

C. Sparks Landen                                                April 24, 2014

```
 1    is the same, is I was verbally told by my tenant and

 2    later read in the complaint by my attorneys.

 3         Q.   And that was your current lawyer?

 4         A.   Correct.

 5         Q.   Okay.  Let me ask you a question.  You did

 6    testify before -- and correct me if I'm wrong --

 7    that you like a machine to last 20 years.

 8         A.   It would be nice.

 9         Q.   And if it doesn't, you're not surprised;

10    correct?

11         A.   I don't know if it's that I'm surprised.

12    If it doesn't, I'll have to replace it.

13         Q.   Okay.  And that's what you did when the

14    other machine lasted seven years; correct?

15         A.   That is correct.

16         Q.   Okay.  So is it your opinion that a machine

17    should last 20 years without any defects whatsoever?

18         A.   I don't know.

19         Q.   Okay.  What about if a machine overflows

20    after 15 years?

21              MR. RAPKIN:  Objection.  Is that a

22    question?

23    BY MR. KIM:

24         Q.   Do you understand my question?

25         A.   What about -- your question was what if a
```

68

C. Sparks Landen                                                    April 24, 2014

1        Q.   Okay.   When did you have the conversation

2   with Mr. Rapkin, who told you that the machines were

3   dangerous?

4        A.   Would have been 2012.

5        Q.   When in 2012?

6        A.   Towards the last quarter.

7        Q.   Okay.

8        A.   Towards September, October, somewhere in

9   there.   October, I'd say.

10        Q.   So I call him Scott.   Mr. Rapkin told you

11   the machines were dangerous somewhere around

12   September or October of 2012?

13            MR. RAPKIN:   Objection.   Assuming facts not

14   in order, and that's not what he testified to.

15   BY MR. KIM:

16        Q.   And after that conversation, when did you

17   buy the Maytag machines?

18        A.   I can't recall.   I believe it was sometime

19   last year.

20        Q.   Okay.   So how were tenants washing their

21   clothes in the interim?

22        A.   What do you mean?

23        Q.   Were they using the Frigidaires?

24        A.   The Frigidaires were removed and replaced

25   with Maytags.

                                                            71

C. Sparks Landen                                                April 24, 2014

1        Q.    But that was in 2013?

2        A.    I believe so.

3        Q.    Okay.  So how were they washing their

4    clothes in the interim?

5        A.    The Frigidaires were removed, and the

6    Maytags were put in on the same day.

7        Q.    Okay.  So they were washing -- they were

8    washing their clothes using the Frigidaires between

9    October, September of 2012 until you replaced them

10   with Maytags; correct?

11       A.    Yes.

12       Q.    Okay.  Why did you allow that?

13       A.    What do you mean?

14       Q.    Well, you said before that these were

15   dangerous machines; correct?

16       A.    From what I had heard, they were

17   potentially dangerous.

18       Q.    So why did you let them continue to use

19   them?

20       A.    They were -- I did replace them, and they

21   were -- the old machines were taken as -- and held

22   as evidence for this case.

23       Q.    So they were held as evidence, but they

24   were still using the machines before then; correct?

25       A.    Before they were held as evidence?

                                                              72

Ex. D
Page 98

C. Sparks Landen                                        April 24, 2014

1        Q.    Correct.

2        A.    Yes.

3        Q.    Why did you allow that to happen?

4        A.    What do you mean why did I allow it to

5    happen?

6        Q.    Well, you testified before you believe

7    these machines are dangerous; correct?

8        A.    Yes.  I was worried.

9        Q.    So your -- that worry, but you allowed them

10   to continue to use them?

11       A.    I was worried.  And when I -- as soon as I

12   could potentially turn them over to have them used

13   as evidence, I replaced them.

14       Q.    But did you tell your attorneys to take

15   them, or did they ask you for the machines?

16            MR. RAPKIN:  Objection.  Calls for

17   attorney-client privilege.

18            Instruct you not to answer that question.

19            THE WITNESS:  I'm not going to answer that

20   question.

21   BY MR. KIM:

22       Q.    So I can't know why the machines were

23   replaced?  Is that -- you're not going to answer

24   that question?  So it could have nothing to do with

25   the fact that they were dangerous; it could have to

                                                          73

Ex. D
Page 99

C. Sparks Landen                                                April 24, 2014

1   building?

2        A.   I don't know.

3        Q.   Are you going to get them repaired?

4        A.   I don't know.  If I win the case, I want

5   them repaired.

6        Q.   And if you lose the case, you don't know?

7        A.   I would like them repaired.

8        Q.   But you never asked Electrolux to repair

9   the machine that broke down in 2012; correct?

10       A.   The machine that broke down in 2012, that

11   was -- you mean the one prior, just before I

12   replaced it with another one in 2012, did I ask --

13       Q.   I'm sorry?

14       A.   You mean the one that broke down and I

15   replaced it with another Frigidaire?

16       Q.   Right.

17       A.   Did I ask them to repair it?  No.  It was

18   outside my warranty.

19       Q.   What do you understand a warranty to mean?

20       A.   Warranties, that I understand them, is they

21   typically last 12 months or less or more depending.

22       Q.   And what do you think that means?  What do

23   you mean they last 12 months?  What lasts 12 months?

24       A.   That -- that if something breaks down

25   within the first early period of owning an

88

Ex. D
Page 100

C. Sparks Landen                                              April 24, 2014

 1    appliance, that the repair would be covered.

 2         Q.   What do you understand happens after the

 3    12 months?

 4         A.   That your warranty is no more.

 5         Q.   And what does that mean?

 6         A.   It means that they're -- I don't expect

 7    that they're going to do anything.

 8         Q.   Okay.  Have you ever bought an extended

 9    warranty?

10         A.   Yes, I believe so.

11         Q.   Okay.  On any of the machines that we've

12    been discussing?

13              MS. SCHMIDT:  You mean all of the garbage

14    disposals, the refrigerators?

15              MR. KIM:  That's a fair point.

16         Q.   How about with respect to the washing

17    machines that you've purchased?

18         A.   Wow.  I'm not sure.  Not to my

19    recollection.

20         Q.   Okay.  What do you understand you would be

21    buying with an extended warranty?

22         A.   The manufacturer to be taking

23    responsibility for repair for a longer period of

24    time.

25         Q.   Why didn't you ever buy an extended

                                                              89

Ex. D
Page 101

C. Sparks Landen                                                    April 24, 2014

1    warranty as far as you recall?

2         A.   I don't know.

3         Q.   Just didn't feel like spending the extra

4    money?

5         A.   Potentially.

6         Q.   Any other potential reasons?

7         A.   Cost is definitely a factor.

8         Q.   So you bought the four-unit building in

9    2005, and correct me if I'm wrong, but there were no

10   washing machines in the units?

11        A.   I don't think so, no.

12        Q.   So you bought four washing machines?

13        A.   I bought three, to my recollection.

14        Q.   You may have answered this.  I apologize if

15   I asked this already, but why didn't you buy one for

16   the fourth unit?

17        A.   The fourth unit, as I recall, was -- the

18   three other units were vacant and in an early stage

19   of remodel.  The fourth unit was still occupied.  I

20   don't recall the whole situation around that

21   particular unit, but I don't think I bought anything

22   for that unit because it was still occupied with the

23   existing tenants.

24        Q.   And there was a machine already in there?

25        A.   I don't remember if there was or not, yeah.

                                                         90

C. Sparks Landen                                                    April 24, 2014

```
 1              MR. RAPKIN:  Objection.  Argumentative.

 2              MR. KIM:  That's not a question.

 3              MR. RAPKIN:  No, it's not.

 4   BY MR. KIM:

 5       Q.   So aside from what you've heard about from

 6   your lawyers, what do you like about the machines?

 7              MR. RAPKIN:  Asked and answered.

 8              THE WITNESS:  I answered that already.

 9   BY MR. KIM:

10       Q.   So there's nothing that you liked about

11   them?

12              MR. RAPKIN:  At the time of the purchase,

13   so we're clear?

14              THE WITNESS:  If you want to ask me --

15   yeah, if you want to ask me about the time of the

16   purchase, if you're asking me about that, I would --

17   I could tell you that -- you know, I would have

18   answer for that, but I don't understand what I like

19   about them.

20   BY MR. KIM:

21       Q.   Well, you owned one for seven years;

22   correct?

23       A.   Yes.

24       Q.   And you bought another one?

25       A.   Yes.
```

                                                              92

C. Sparks Landen                                                April 24, 2014

1          Q.   So what did you like about the machine that

2    you bought another one?

3          A.   It fit in the same space, and it was the

4    right size for the space.  It was a good price, and

5    it was my understanding that, as a rule, Frigidaire,

6    that brand name, was meant to be or supposed to be a

7    good, solid brand; so I purchased another one.

8          Q.   When you said that's the rule, where did

9    you hear that rule?

10         A.   Frigidaire is a company that's been around

11   for -- I don't know how long.  Many, many,

12   many years.  Kind of a household name.

13         Q.   And you had experience with Frigidaire

14   machines; correct?

15         A.   What do you mean experience?

16         Q.   Well, you owned one for seven years.

17         A.   Yes.

18         Q.   Okay.  And did that reinforce your idea

19   that Frigidaire was a strong brand?

20         A.   I never really gave it much thought until

21   the first one broke down, and then I just felt it

22   was a fluke because the other two were working.  So

23   I purchased another.

24         Q.   Where did you buy those three machines in

25   2005?

                                                              93

Ex. D
Page 104

1        A.   Carlsons Appliances in Santa Monica.

2        Q.   Do you buy all your appliances there?

3        A.   Have I purchased all my appliances there,

4    no.

5        Q.   Why in this particular -- have you ever

6    bought anything before you bought those three

7    machines from Carlsons?

8        A.   I don't think so.

9        Q.   Why, in this occasion, did you go to

10   Carlsons?

11       A.   Local company.  It was probably convenient

12   for me at the time.

13       Q.   So convenience; correct?

14       A.   And it was local, yes, which was

15   convenient.

16       Q.   So you were there when they were purchased?

17       A.   What do you mean I was there when they were

18   purchased?

19       Q.   Did you go to the store and buy them?

20       A.   Yes, I went to the store and picked them

21   out and purchased them.

22       Q.   Were they on sale?

23       A.   I don't think so.

24       Q.   So you bought them because of fit, price,

25   and because of the rule, as you put it?

                                                        94

Ex. D
Page 105

C. Sparks Landen                                              April 24, 2014

1        A.   Well, yeah.   You know, this was my -- this

2   was my apartment building.   I wanted to put

3   something in there that I felt would be -- you know,

4   bring me longevity, that was a good unit with a good

5   brand name, that would last and provide, you know,

6   good use for my tenants.

7        Q.   So did you go in with specific

8   measurements, because you said fit, they had to fit

9   the --

10       A.   Yeah.   I had -- I had -- they had to

11  accommodate -- not really -- I wasn't very familiar

12  with stack units, the stacking units.   So yeah, I

13  measured to make sure that they would fit.   I wanted

14  to make sure that they would fit in the space, of

15  course.

16       Q.   And then price.   What about the price did

17  you like?

18       A.   I recall it being -- I don't remember the

19  price exactly, but I think it wasn't the cheapest;

20  it wasn't the most expensive.   It seemed like a good

21  brand.

22       Q.   Okay.   So for your own personal residence,

23  what kind of washing machine do you have?

24       A.   I think it's a Whirlpool.

25       Q.   Why didn't you get Whirlpools for your

                                                           95

1    apartment?

2         A.   I don't know.  I just didn't at the time.

3    I bought Frigidaire.

4         Q.   Would a Whirlpool fit in the space?

5         A.   I don't know.

6         Q.   Did you consider Whirlpools?

7         A.   I don't recall.  I would now.

8         Q.   What other machines did you consider at the

9    time?

10        A.   That's a long time ago.  I don't recall

11   what else may have been there.

12        Q.   Okay.  So basically you just walked into

13   the store and whatever they had?

14        A.   I walked into the store and looked at what

15   they had, yes.

16        Q.   Based on the fit, according to your

17   measurements, and the price; correct?

18        A.   Correct.

19        Q.   Okay.  Do you recall submitting a

20   declaration in this case?

21        A.   Yes.

22        Q.   Okay.  I'd like to refer to that

23   declaration.

24             MS. SCHMIDT:  Do you want to provide him a

25   copy?

96

Ex. D
Page 107

C. Sparks Landen                                                    April 24, 2014

1              MR. KIM:  I can just read it.

2      Q.    Paragraph 3 of the declaration stated:

3             On or about June 7, 2005, two

4      Frigidaire model FGX813CS laundry centers

5      were purchased at my request as part of

6      my agreement to purchase my apartment

7      building.

8      A.    Okay.

9      Q.    Does that sound accurate?

10     A.    June 7th.  Yeah, that was around that time.

11     Q.    So you agree with that statement?

12     A.    Could you read it again?

13     Q.    Sure.

14            On or about June 7, 2005, two

15     Frigidaire model FGX813CS laundry centers

16     were purchased at my request as part of

17     my agreement to purchase my apartment

18     building.

19     A.    Yeah.

20     Q.    You agree with that statement, okay.

21            And you requested those specific machines

22     as part of your agreement to buy the building?

23     A.    I had a choice to pick my own machines.  So

24     I went to the store and picked out the machines I

25     wanted.

                                                              97

1        A.    That I had two other ones, yes.

2        Q.    And did you go to the store to buy the

3    Frigidaire machine in 2012?

4        A.    I don't -- I'm not sure if I went there or

5    if I just called and ordered it.

6        Q.    Okay.

7        A.    I'm not sure.

8        Q.    How did you know what to order?

9        A.    Because I would have purchased at the same

10   store.

11       Q.    But how would you know, just calling them

12   up, what to order in terms of a model?

13       A.    Oh, I just -- I would have -- if I did it

14   over the phone, I would have just called and said,

15   Hey, the Frigidaire that I have that I put in my

16   San Juan building, I need another one.  And if I

17   would have went in, I would have probably said the

18   same thing.  I just don't recall if I called it in

19   or went in.

20       Q.    And they knew what you were referring to?

21       A.    Well, I had purchased there before.  So

22   they had my file, my account, and they can just look

23   it up and see what I purchased prior.

24       Q.    And the fourth unit, you eventually got a

25   Maytag machine; is that correct?

102

C. Sparks Landen                                                April 24, 2014

1      Q.    Okay.

2      A.    I think I tried to see if it would fit, and

3   I don't think it fit in there.

4      Q.    Where did you buy that machine?

5      A.    Oh, boy.  Where did I buy that machine.  I

6   may have bought it from Carlsons.  I think I did buy

7   it from Carlsons.

8      Q.    So did you go to the store to buy it?

9      A.    I believe so.  I would think I would have,

10  yeah, because I would have wanted to see it, because

11  if it was something new, yeah, I would have to pick

12  it out.  So I would imagine I went, yeah.

13     Q.    Okay.  So you gave them the dimensions

14  and -- why did you need to see it, just out of

15  curiosity?

16     A.    I like to see what things look like.

17     Q.    Okay.  Why?

18     A.    Options, general feel.  I look at

19  something, does it look like it's well made, does it

20  look quality, does it look nice enough to go in my

21  building, where the controls are located, are they

22  on the top, are they in the middle.  I consider a

23  lot of things.  And of course aesthetics.

24     Q.    Anything else?

25     A.    Not that I can recall.

                                                            104

Ex. D
Page 110

1    Q.   Either/or, if you --

2    A.   Yeah, I mean, there's probably something

3  somewhere, but I don't recall.  You know, you could

4  ask me about a specific time and place, and I could

5  try to figure it out, but I -- I don't know.

6    Q.   It's hard for me to figure it out.  I don't

7  know.  Is there any other properties that we haven't

8  discussed that you've owned?

9    A.   I don't think so.  Yeah, I don't think so.

10  I think we discussed them all.

11    Q.   Let me ask you this.  You're currently a

12  real estate investor; correct?

13    A.   I am a real estate agent.

14    Q.   Okay.

15    A.   And investor.

16    Q.   When did you become an agent?  I don't

17  think I ever asked you that.

18    A.   2000 -- I think around 2007.

19    Q.   And did you stop your own independent work

20  as a kitchen designer at that point?

21    A.   I think I stopped kitchens prior to that.

22    Q.   Okay.  Have you done anything else?  Have

23  we covered all of your employment after high school?

24    A.   I did some random other employment.  Do you

25  really need -- you want to hear it?

106

C. Sparks Landen                                                                 April 24, 2014

1          A.   Yes.

2          Q.   So when you bought the three Frigidaire

3    machines in 2005 for the four-unit building in

4    Venice, did you see any advertisements for

5    Electrolux washing machines?

6          A.   Not that I recall.

7          Q.   Did you do any kind of online research?

8          A.   I don't recall.

9          Q.   What about consumer reviews, did you visit

10   any websites to see if there were any reviews about

11   Electrolux washing machines?

12         A.   Not that I recall.

13         Q.   Did you go to the Electrolux website?

14         A.   Not that I recall.

15         Q.   Consumer Reports?

16         A.   From what I recall, I walked into the

17   store, bought the units.

18         Q.   So that may moot my next question, but did

19   you talk to any friends or relatives?  I know

20   earlier you said you didn't know anyone who owned an

21   Electrolux washing machine.

22         A.   Not that I recall.

23         Q.   Before the conversation in

24   September/October of 2012 with Mr. Rapkin, have you

25   ever heard of a washing machine overflowing?

                                                              114

C. Sparks Landen                                                    April 24, 2014

```
 1   didn't do any research beforehand; you just walked

 2   in and bought it?

 3        A.   I'm sorry, one more time.

 4        Q.   Sure.  The machine that you bought in 2012

 5   to replace the old one.

 6        A.   Yes.

 7        Q.   You said -- you testified earlier that you

 8   called up Carlsons and you said that you wanted

 9   another machine like the one you had; correct?

10        A.   I said I may have called them or I may have

11   gone in, that I didn't recall.

12        Q.   That's correct.

13        A.   That's what I remember.  It was one of the

14   two.  I would either had to have gone in, or I would

15   have had to have called.  I just don't recall which

16   one that would have been.

17        Q.   And would the same hold true that you

18   didn't do the same type of -- you didn't do any

19   research on that either?

20        A.   No, I just replaced it with the same unit

21   that I had.

22        Q.   Okay.  So when you walked into Carlsons in

23   2005 to buy the three Frigidaire washing machines,

24   did you notice any signs in the store relating to

25   the machines?
```

                                                              116

Ex. D
Page 113

C. Sparks Landen                                                    April 24, 2014

```
 1   machines?

 2        A.   I think that's yet to be seen.

 3        Q.   What if I told you they were wrong, would

 4   that change your opinion of the machines?

 5        A.   Are you asking me a question?

 6        Q.   It's framed as a question.

 7        A.   I don't really know you.  I don't know what

 8   you would -- I don't know your credibility as a --

 9   as an expert on Frigidaire machines.

10        Q.   What if they were wrong, would that change

11   your opinion?

12        A.   If they were wrong, would that change my

13   opinion?

14        Q.   Correct.

15        A.   Would it change my opinion about

16   Frigidaire?

17        Q.   Correct.

18        A.   If they were wrong.  Are you saying that if

19   they were wrong and the machines do not overflow?

20        Q.   Correct.

21        A.   Would it change my opinion about

22   Frigidaire?  Yes, it would.

23        Q.   Okay.  I know you didn't -- after you had

24   the conversation October, September 2012, the

25   tenants continued to use the machines until you
```

                                                              133

C. Sparks Landen                                               April 24, 2014

1   replaced them with Maytags; correct?

2        A.   Yes, correct.

3        Q.   Okay.  Did you warn them that the machines

4   were dangerous?

5        A.   No.

6        Q.   Why not?

7        A.   Because I was -- didn't want to alarm

8   anybody initially.

9        Q.   What do you mean by initially?

10       A.   I was working on a way to have it

11  rectified, which I did hand my faulty machines over

12  to my attorneys for evidence.

13       Q.   The next year.

14       A.   Shortly thereafter, as I recall.

15       Q.   But you didn't warn them that these were

16  extremely dangerous machines that could ruin your

17  building?

18            MR. RAPKIN:  Asked and answered.

19            THE WITNESS:  I did not mention that.

20  BY MR. KIM:

21       Q.   Because --

22       A.   To alarm anybody.

23       Q.   Because you didn't see a need to do it?

24            MR. RAPKIN:  Objection.  Argumentative.

25            THE WITNESS:  You're asking me a question?

                                                        134

1  STATE OF CALIFORNIA        )
                              ) ss:
2  COUNTY OF LOS ANGELES      )

3

4        I, RUTH C. MOORE, do hereby certify:

5        That I am a duly qualified Certified Shorthand

6  Reporter, in and for the State of California, holder of

7  certificate number 8444, which is in full force and

8  effect and that I am authorized to administer oaths and

9  affirmations;

10       That the foregoing deposition testimony of the

11  herein named witness was taken before me at the time and

12  place herein set forth;

13       That prior to being examined, the witness named

14  in the foregoing deposition, was duly sworn or affirmed

15  by me, to testify the truth, the whole truth, and

16  nothing but the truth;

17       That the testimony of the witness and all

18  objections made at the time of the examination were

19  recorded stenographically by me, and were thereafter

20  transcribed under my direction and supervision;

21       That the foregoing pages contain a full, true

22  and accurate record of the proceedings and testimony to

23  the best of my skill and ability;

24       That prior to the completion of the foregoing

25  deposition, review of the transcript was requested.

                                                    157

1        I further certify that I am not a relative or

2   employee or attorney or counsel of any of the parties,

3   nor am I a relative or employee of such attorney or

4   counsel, nor am I financially interested in the outcome

5   of this action.

6

7        IN WITNESS WHEREOF, I have subscribed my name

8   this 4th day of May , 2014.

9

10

11   _____

12   RUTH C. MOORE, CSR No. 8444

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                        158