Jerome L. Ringler (State Bar No. 59918)
E-mail: jlr@ringlerschmidt.com
Catherine Burke Schmidt (State Bar No. 212827)
E-mail: cbs@ringlerschmidt.com
RINGLER SCHMIDT
A LAW CORPORATION
233 Wilshire Blvd., Suite 900
Santa Monica, CA 90401
Tel: 310-955-4105/Fax: 310-955-4106

Michael S. Rapkin (State Bar No. 67220)
E-mail: msrapkin@gmail.com
Scott B. Rapkin (State Bar No. 261867)
E-mail: scottrapkin@rapkinesq.com
LAW OFFICES OF MICHAEL S. RAPKIN
233 Wilshire Boulevard, Suite 700
Santa Monica, CA 90401
Tel: 310-319-5465/ Fax: 310-319-5355

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

SPARKS LANDEN, individually and on behalf of all others similarly situated,

Plaintiff,

v.

ELECTROLUX HOME PRODUCTS, INC., a Delaware Corporation; CARLSONS APPLIANCES, INC. a California Corporation; and DOES 1 through 20, inclusive,

Defendant

Case No.: CV13-01033-DSF (SHx)

**DECLARATION OF RONALD L. PARSONS IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

Hearing:
Date: June 30, 2014
Time: 1:30 p.m.
Ctrm: 840

Trial Date: None Set
Scheduling Conf.: To Be Set Upon Ruling
Complaint Filed January 8, 2013

I, RONALD L. PARSONS, declare as follows:

1. I have been retained by Plaintiff in the above reference matter filed against Electrolux Home Products, Inc. ("Electrolux"). If called as a witness, I would competently testify as to the matter set forth in this declaration.

2. I have reviewed Plaintiff's Notice of Motion and Motion For Class Certification ("Plaintiff's Motion") and documents filed therewith, along with Defendant Electrolux Home Products, Inc.'s Opposition To Plaintiff Sparks Landen's Motion For Class Certification (the "Opposition") and the documents filed therewith.

3. I attended Fitchburg State College in Fitchburg, Massachusetts for two years. I studied in the Industrial Arts Program. The Industrial Arts Program was the precursor for teaching industrial vocational education. The Industrial Arts Program consisted of metalworking, welding, joining, woodworking, materials, and communications.

4. I have a Masters Certification from the National Institute of Automotive Service Excellence in automotive technology. The pre-qualifier for the ASE certification requires training, education, and experience. Upon completing the prerequisites, exams are given for every level of certification. Currently, there are approximately 330,000 certified individuals through ASE. Currently, I have obtained 47 individual certifications which makeup the masters certification program. Only three individuals in the history of ASE have ever reached this level of certification. In order to remain ASE certified, the ASE certifications must be retested every five years, in order to stay up to date on the ever-advancing automotive technology. I have continually maintained my certifications through the ASE five-year examination policies.

5. The National Institute for Automotive Service Excellence is supported by the Society of Automotive Engineers, all American automotive manufactures, professionals, aftermarket manufacturers and educators. My extensive training and

certification through the National Institute of Automotive Service Excellence is my basis for the basic engineering disciplines in electrical, mechanical, and hydraulic disciplines. The design analysis of automotive systems requires the knowledge of multiple engineering disciplines.

6. The issue to be addressed in the subject case is whether the design componentry identified below is adequate. The design componentry at issue is componentry specifically designed to transfer liquid and gas via an air hose from point A to point B. This transfer of liquid and gas via an air hose is a common design issue in multiple vehicle systems. I am specifically knowledgeable both with regard to vehicle systems and washing machine systems that transfer liquid and gas mixtures from point A to point B via air hoses.

7. I am currently employed by the Wright Group, Inc. as an origin and cause analyst, design analyst, and mechanical failure analyst. I have been in the field of origin and cause analysis, design analysis, as well as a mechanical failure analysis for 35 years. As part of my responsibilities at the Wright Group, Inc., I analyze the designs of products and their electrical and mechanical control and safety devices, and the failure modes for these controls, devices and components. Due to my experience analyzing the designs of products, including home appliances, as they relate to failure modes and analyzing mechanical failures of electrical and mechanical components, including components in home appliances, I have experience and expertise with basic engineering and design principles. Since 2006, I have been the manager of the Engineering and Technical staff at the Wright Group, Inc. Additionally, I manage the Wright Group, Inc.'s water-based mechanical laboratory, which has inspected and analyzed over a thousand water-based appliances for water-related failures. Since my employment at the Wright Group, Inc., I have analyzed appliances for failure modes. As part of my responsibilities I have been directly responsible for multiple designs in appliances that prevent failures. Specifically, I have designed a water overflow protection system for

washing machines. Additionally, I have designed specific components for laundry-based products to eliminate the hazards associated with these products. I have been designated as an expert in approximately 10 cases involving the very defect at issue in this case. In addition, I have been designated as an expert in approximately 200 cases involving design defects in dryers, including many Electrolux dryers, which result in fires and other mechanical failures.

8. The concept of adequate hose length and adequate connectors is not unique to washing machines. This is a matter of mechanical and fluid dynamics. It applies to every situation where flexible hoses carry gases or liquids between two points, where the distance between the two points can change. This change in dimension places stresses upon the hose during the operation of the product. Flexible hoses that connect from part A to part B so as to allow the passage of liquid and/or gas exists in numerous machinery manufactured by a wide variety of industries, including the design componentry at issue. When an adequate hose length is used to cover the distance necessary, and adequate strain relief features are used, the hose does not suffer undue stress and does not fail prematurely. This design componentry at issue is applied in a myriad of circumstances including the automotive industry as well as other manufacturing industries. I have addressed this very design componentry not only in my work at the Wright Group in evaluating over 1000 washing machines, but also in my extensive work in auto engineering and design.

9. I have been personally involved at the Wright Group in testing over 200 washing machines that were made by this very defendant, Electrolux, and that resulted in failure (overflow) as a result of this specific defective design componentry at issue here. The various machines that come to the Wright Group for testing often are provided by insurance carriers, who have covered losses due to injuries and damages occasioned by machine overflow and who have entrusted the Wright Group to analyze and evaluate the design componentry that leads to overflow. I have been personally

involved in the inspection of at least a couple hundred washing machines manufactured by Electrolux that have failed, and caused overflow, as a result of the air hose disconnecting from either the air dome or pressure switch. I have been personally involved in the inspection of the following models: 417.92702200; 417.93702200; 417.94702300; 417.94872302; 417.98702891; 417.99802990; 417.99862990; CRWS5700AS0; FEX831CS0; FWS235RFS3; FWS445RFS0; FWS445RFS2; FWS445RFT2; FWS446GHS0; FWSB34RGS0; FWX223LBS5; FWX223LBS6; FWX223LBS8; FWX445RFS3; FWX6970EW4; GLWS1349AS1; GLWS1649AS; GLWS1649AS2; MWS445RES1; WSM2700AWW; WSM2700DAWWW; WSM2700WCWWW; WSM2780DBWWW; WSM2780DWW; and WWX433RFS0. In my observation of Electrolux washing machine failures, 90% of disconnections occur in the connection of the air hose to the air dome.

      10.    As the Court will see from the following, the design componentry criticized in this case by Plaintiff is extraordinarily simple. It involves simply extending the length of air hose that should exist between the pressure switch and the air dome and providing appropriate fixation for the air hose at the air dome and at the pressure switch, nothing more. This basic design componentry applies to each and every model Electrolux claims varies from each other and in each such model, the air hose extending from the air dome to the pressure switch is of inadequate length and the method for affixing the air hose to the air dome and to the pressure switch is inadequate due to inadequate fixation componentry. The models of machines Electrolux manufactures that contain this design componentry have a propensity to overflow. Attached as Exhibit A, purely for reference, are Electrolux illustrations of the air dome, the air hose, and the pressure switch that are the components of the claimed defective design. These three aspects of the design componentry at issue exist in each of the Electrolux models in question, despite Electrolux's protestations to the contrary.

11. The reason that the componentry in question is required is that it is necessary in the operation of all Electrolux models at issue to transfer a liquid and gas mixture from the air dome to the pressure switch. This is required to control the water level within the washing machine tub and liner. If the air hose disconnects from either the air dome or the pressure switch, a water overflow will occur. This is true because in such instances the water level pressure switch cannot monitor the water level within the washing machine.

12. As set forward in Plaintiff's Motion, the design features that comprise the defect as claimed by Plaintiff are as follows:

(a) There is an inadequate length of air hose that extends from the air dome to the pressure switch;

(b) Due to the inadequate length of air hose, identified in (a) above, under operating conditions the air hose disconnects from either or both the air dome and/or the pressure switch;

(c) The disconnection as identified in (b) above, causes overflow resulting in water extending beyond the washing machine and onto the surface of the floor outside the perimeter of the machine;

(d) In addition to the design defects identified in (a)-(c) above, Plaintiff claims the design defects also include an inadequate method of fixation of the air hose at the air dome end and an inadequate method of affixation at the pressure switch end. This improper affixation contributes to and encourages a disconnection of the air hose at the air dome end and at the pressure switch end, thus, compounding the defect of the inadequate air hose length discussed above;

(e) Based on the foregoing, and based on my experience, it is clear that a certain number of washing machines containing the defects identified in

(a)-(d) above will fail before the expiration of useful expected life of the machine.

(f) The design componentry at issue claimed to be defective can easily be remedied by increasing the length of air hose utilized and affixing the increased air hose length at both the air dome end and the pressure switch end with the use of barbed connectors and clamps. And to be certain that the componentry is properly designed the barbed connectors and clamps should be used at both the air dome end and the pressure switch end.

(g) The term service loop as utilized in this declaration merely refers to the additional length of air hose Plaintiff believes the design componentry requires for the reason stated above so as to preclude disconnection for the reasons stated above during operation of the subject washing machines.

(h) The term adequate strain relief as utilized in this declaration merely refers to the concept that an adequate length of air hose between the pressure switch and the air dome properly secured as earlier described will relieve the strain on the air hose and its connections sufficient to preclude the disconnection of the air hose, which when disconnected causes overflow.

(i) The reason that the componentry in question is required is that it is necessary to transfer a liquid and gas mixture from the air dome to the pressure switch in the operation of all Electrolux models at issue for the reasons expressed in paragraph 11, above.

13. Thus, as will be pointed out below, the design componentry in question that Plaintiff claims is defective can be adequately remedied by an adequate length air hose that extends between the air dome and the pressure switch and that is appropriately affixed at the air dome connection and the pressure switch connection, which will thus provide adequate strain relief on the connection of the air hose during the operation of

the machine, precluding overflow. As will be pointed out below, in each and every one of the alleged different designs offered by Electrolux, each suffers the identical defect, namely, inadequate air hose length between the pressure switch and the air dome together with inadequate fixation of the air hose at the pressure switch and the air dome thus allowing for overflow during the machine operation due to ineffective and inadequate strain relief, i.e. there is too much strain on the hose and it disconnects because it is too short and isn't affixed to the air dome and to the pressure switch properly.

14. As Plaintiff's Motion accurately points out in each of the subject models there exists a common design where a piece of air hose of inadequate length inadequately connects the air dome to the pressure switch. If the air hose disconnects from the air dome during operation of the machine, the washing machine will overflow. The root cause of the design defect is the inadequate strain relief utilized to prevent disconnecting of the air hose from the air dome on the one end and from the pressure switch on the other end.

15. The various differences in componentry alleged by Electrolux in its Opposition are wholly immaterial and irrelevant to the design failure of the componentry in question. The design defect of an inadequate hose length and inadequate strain relief in the connections of the air hose between the pressure switch and the air dome will cause overflow regardless of the various design features referenced in Electrolux's Opposition. This design failure will exist as a threat to overflow in each and every model where it exists and the differences in other aspects of the machine as described by Defendant are irrelevant, immaterial and of no engineering significance as it relates to the design componentry at issue and claimed to be defective in Plaintiff's Motion.

16. For example, while it may be true that there are 23 different lengths of air hose, these differences in length are immaterial. This is true because each is inadequate

to cover the distance necessary and to incorporate a service loop in its connection to: the air dome on one end; and the pressure switch on the other end. All 23 lengths fail to adequately provide for clearance in the amount necessary to prevent overflow because they lack a service loop, i.e., they are simply too short.

17. The various changes and types of pressure switches utilized by Electrolux are irrelevant and immaterial to the alleged design defect because the changes in the pressure switches do not affect its connection to the air hose. As a hypothetical, even if one were to assume that the change in the pressure switch design that changes in various models did have some affect on the adequacy of the pressure switch connection, it would nevertheless remain the case that each model would still suffer from inadequate strain relief due to inadequate air hose length, and that each model would still suffer from inadequate strain relief due to inadequate fixation of the air hose to the air dome. Thus, the incidents of overflow wouldn't change. At best for Electrolux, these factors would merely encourage disconnection at the air dome to a larger extent than at the pressure switch connection.

18. I have reviewed the report submitted by Electrolux that was declared to be authored by Prof. Jahan Rasty, Ph.D., PE, MBA. The report considers variations that can lead to a disconnection of the air hose from the air dome and/or from the pressure switch. Despite the fact that there are a number of factors that can lead to disconnection, there is no dispute that if the air hose disconnects, the washing machines will overflow. The report illustrates the degrees of likelihood that a disconnection will occur. Prof. Rasty states in his report that various forces are created causing differences in stresses on the subject componentry during the operation cycle of various models. This is immaterial. What remains unaltered by his report is the fact that regardless of the forces created in the operating cycles of various models, the forces on the air hose is greater than the design componentry can accept because the hose is too short and inadequately affixed. This is true in each model referenced by Prof. Rasty.

19. The report does not identify a single machine or model of machine that contains a barbed connection of the air dome/the pressure switch to the air hose, and the utilization of a service loop secured by a clamp. The report does not identify a single machine or model of machine that contains a barbed connection of the pressure switch to the air hose, and the utilization of a service loop secured by a clamp. The only mention in the report of the utilization of any service loop and/or clamp is limited to the connection of the air hose to the pressure switch of stacked laundry centers that utilize a gas dryer. However, even in this limited selection of models, the design failure of the connection of the air hose to the air dome is consistent with all other machines and models described in the report. In other words, even in gas stacked laundry centers, the connection of the air hose to the air dome fails to contain a barbed connection of the air dome to the air hose, and fails to utilize a service loop secured by a clamp. At best for Electrolux, these factors would merely encourage disconnection at the air dome rather than at the pressure switch connection. This is true because the short hose inadequately affixed to the air dome will have a greater tendency to separate when the hose fails to possess adequate length and fails to be appropriately affixed.

20. The report concludes that utilization of a metal connection of the pressure switch versus a plastic connection of the pressure switch affects the amount of force necessary to disconnect the air hose from the pressure switch. However, these differences are irrelevant because both a metal connection and a plastic connection will allow for disconnection unless the connection is barbed and the air hose contains a service loop secured by a clamp.

21. The report describes the fact that pressure switches are more prone to wear and tear and become less accurate in measuring water levels as compared to electronic transducers. However, differences in ability to measure the water level are irrelevant to concluding that washing machines that utilize a pressure switch versus an electronic transducer contain a common design – inadequate air hose length and inadequate

fixation of the air hose – that can lead to disconnection and overflow. In other words, where there is a disconnection, the machine cannot measure the water level, regardless of whether the machine utilizes a pressure switch or electronic transducer.

22. The report concludes that the differences in design of the vibration absorption system affects how much force is needed to disconnect the air hose from the air dome and from the pressure switch and must be considered in connection with the motion producing components to determine adequate strain relief. Similar conclusions are offered with respect to the spin speed, the weight of the machines, and the duration of wash cycles. In other words, the report concludes that different spin speeds produce differing amounts of force, that lighter machines (i.e., free standing washing machines) produce more force, and that longer wash cycles produce more force on the connection of the air hose. These conclusions reinforce Plaintiff's allegation that a water level pressure system that utilizes an air dome, air hose and pressure switch are defective if the air hose is not of sufficient length and does not have adequate fixation that can lead to disconnection and overflow. And this same analysis defeats Electrolux's claim that laundry centers should somehow be analyzed differently.

23. The report discusses the inner diameter of the air hose in relation to the diameter of the connection to either the air dome or the pressure switch and concludes that there are differences in interference fit. However, the differences in interference fit are irrelevant to determining that any washing machine that utilizes an air dome, air hose, and pressure switch in its water level pressure system design will fail if the air hose is too short and the connections of the air hose to the air dome and/or pressure switch are not adequately secured.

24. The variations described in the report as to the application of the strain relief tape and the use of strain relief solvent support a conclusion that Electrolux's design for strain relief is inadequate because improper application of the tape and/or solvent compromises its intended strain relief. Moreover, for all of the reasons stated

above, these variations are irrelevant to the determination that washing machines utilizing an air dome, air hose, and pressure switch contain a common design that require an adequate hose length and adequate fixation of the hose to the air dome, tub liner, and to the pressure switch.

25. Finally, the report describes the differences in resulting forces produced by incorrect installation and service of the machine. Again, these are irrelevant in the determination of the existence of a common design of the water level pressure system.

26. In order to adequately address the defective design componentry, there would be a cost for each machine. That cost would include the cost of parts that I approximate to be less than $10.00. That cost would also include the cost of labor that I would estimate to be $50-$100 at the site of the repair. At the site of manufacture, I estimate the cost of repair is significantly less.

I declare under penalty of perjury under the laws of the State of California and the laws of the United States that the foregoing is true and correct.

Executed this 11 th day of June 2014, at Uxbridge (*city*), MA (*state*).

By: [signature]
Ronald L. Parsons

**Exhibit A**



Publication No. 5995318457 FWS445RF

CONTROL PANEL

Water level pressure switch
39
9
29
15
17
20
3
5
8
2
56
4
18
25
21
12
31
6
22
27

P12C0053

02/99 8

Parsons Decl. Ex. A
Page 014



Publication No.
5995318457
FWS445RF
MOTOR/TUB
Air Hose
66
67
56
57
3
10
11
19
12
6
13
9
7
53
14
15
16
52
51
18
4
47
68
59
62
26
45
58
49
43
21
20
40
41
17
47
22
35 36 37
34
23A
38
23
28
33
24
27
29
30
31
32
48
P12T0046
02/99
4

Parsons Decl. Ex. A
Page 015

# This Page Filed Under Seal